Mr. Thompson, you reserved four minutes of your time for rebuttal, correct? Yes, Your Honor. And Ms. Maynard, you reserved three minutes of, 15 minutes, three minutes for the cross appeal? Yes, Your Honor. Thank you. Okay. You may proceed. May it please the Court, good morning, Ben Thompson from Fish and Richardson for Figenix. Figenix's appeal concerns two summary judgment grounds the below court entered adverse to I'd like to begin with the court's judgment stemming from its decision to strike Figenix's experts infringement report. Now, Figenix's expert's opinion, it was not a new theory. At most it was a subset or targeting a subset of the theories plainly disclosed in Figenix's infringement contentions. The infringement contentions expressly accused Cadsilla usage in patients that had been pretreated with two chemotherapy agents, Trastumasab, let me try that again, Trastuzumab and Taxane. The expert's infringement theory accused the same treatment, treatment with Cadsilla following pretreatment with these two other chemotherapy agents. Why is it that you narrowed your infringement contentions? So my firm was not involved at that specific time in this case. We came along after the infringement contentions, sorry, after the motions for summary judgment were ordered. It was Figenix's position that there was no narrowing. The theory with the whole time was administration of Cadsilla following treatment with Trastuzumab and Taxane is the infringement. And that's what the infringement contentions say. They don't mention other compounds. Granted, the infringement contentions didn't say and nothing else, they also did not say at least Trastuzumab and Taxane. What is the percentage of patient population that would receive the drug with just those two other drugs? I think I read somewhere, I'm not expressing myself well, but I think I read somewhere that the narrowed, if you don't mind me using that phrase, but the narrower infringement contentions would only cover 4% of the people who take this medication. Is that an accurate statement? I believe that was the prognostication that Figenix's expert made based on the data before him. Yes, it would be a small percentage. However, we're willing to adopt the assumption that Figenix's expert was proceeding on a narrower subset. Are you arguing that adding the limitation and nothing else, that's not, that did not develop a new theory of infringement? We're willing to assume that it is a narrower theory than what was disclosed in the infringement contentions. And even adopting that assumption that Figenix's expert was pursuing this narrower theory against a subclass of the patients that would be encompassed by Figenix's infringement contentions, the district court nevertheless abused its discretion. And I'll tell you why. The district court found that disclosing the broader contention of administering Cadsilla to all patients meeting the criteria required by the Cadsilla label, meaning at least Trastuzumab and Ataxane before Cadsilla, does not adequately disclose a narrower theory of administering Cadsilla to a specific subpopulation of patients. But we believe that's factually inaccurate. By definition, if I say in my infringement contentions, I'm accusing A, B, C, and D, these classes of patients, and my expert proceeds only on subclass of patient A, nevertheless the defendant was on notice of that theory. You think that it's sufficient that the subclass was identified? Every time? I mean, in every infringement contentions, it doesn't matter so long as at least some subclass is identified, even if it's 96% and there are only 4% are the ones that are actually accused of infringement? I'm not willing, in case I have to come back here later and argue something different, I'm not willing to say every time. But in this case, we can't forget that the infringement contentions specifically said Pax 2 is inhibited when you give Cadsilla following pretreatment with Trastuzumab and Taxane. It wasn't this hidden subclass that was not articulated in the infringement contentions. It was the only combination of drugs that was specifically identified in the infringement contentions. But despite the degree of narrowness that we're talking about here, it is the addition of a new limitation, and that limitation was not included in the infringement contentions. I respectfully disagree. The infringement contentions say what they say. It's Cadsilla following pretreatment with Trastuzumab and Taxane. They're not saying nothing else. Correct. But even if they could be read to include that broader subclass, again, there's no real prejudice to Genentech when they're on notice that Phygenics' infringement contentions are also targeting the infringing subclass. It's a negative limitation, really, is what it is, right? Correct. But if I'm in Genentech's shoes and I know that there's this broader class of patients who are accused of infringement, I have to develop infringement theories for all of the various subclasses. This is not the same as a new infringement theory where you're ambushing someone late in litigation with new infringement theories that they were not aware of. What made this error worse is when the court applies case law directed only to new infringement theories, not narrower theories. And there's no dispute that the court relied only on case law concerning new theories. The district court, not the district court and not Genentech, has anyone identified a case where a district court properly struck an infringement theory for being narrower than what was in the infringement contentions? It was struck because of the prejudice that it caused to the defendant. This is after the fact discovery had closed. I believe Genentech had even conducted some experimentation to prove its case and all of that kind of went into the wastebasket, didn't it? It did not. If Genentech was conducting experiments to disprove infringement, it should have conducted experiments to disprove infringement with respect to the entire class of patients accused in the infringement contentions. If it didn't do that, that was Genentech's mistake. What about the abuse of discretion standard that we have to apply? How do you see that the district court abused its discretion? It's obviously a very deferential standard. Yes, it is, Your Honor. First reaching the factual mistake that the broader contentions don't disclose the narrower contention, that was an error that led the court to apply an apposite case law. Given the time I have, I'd like to shift over to the inducement issue, if I may, quickly. The district court also found that there was not sufficient evidence of Genentech's intent to prescribe Cacilla to this subset of patients. The Cacilla label plainly indicates it should be administered to patients pre-treated with Trastuzumab and Ataxan, and that is the specific combination that is accused in this case. Further, Genentech admitted that it expects Cacilla to be administered in accordance with these instructions. That was in response to an RFA at Appendix 729. The district court even found that the Cacilla label instructs physicians to administer Cacilla to all patients that have previously received Trastuzumab and Ataxan. That's in the district court's opinion at Appendix 12. Given the express instructions on the Cacilla label in combination with Genentech's admission that it's encouraging Cacilla's administration in accordance with that label, those two things alone should have provided sufficient circumstantial evidence on the intent element of inducement to get past summary judgment. Now, where things went awry here is the court looked past the instructions on the Cacilla label and proceeded to apply case law concerning off-label administration or off-label prescription of drugs. Although the court said that's a distinction without a difference, that's not actually true. In these on-label cases, such as the Sanofi case, you can infer the drug maker's intent purely by the instructions on the label, and that's where we are here. The Cacilla label, and we can look at it, it's at Appendix 2252, specifically says, here's Cacilla. You should give it to patients that have been previously treated with Trastuzumab and Ataxan. That's the infringement theory. That's what the label says you should do. Do you think the Sanofi case makes it so the district court erred in relying on the substantial non-infringing uses? Exactly, Your Honor. Because in off-label cases where you don't have a label that specifically instructs infringement, you start to look other places to try and infer the drug maker's intent because you don't have the label to point to. In that situation, like Judge Freeman did at the district court, she looked at the prevalence of the drug's use in a specific infringing scenario and other factors that were not appropriate to look at when you're in a situation in an on-label case. And Sanofi actually says that. It says, well, even if there are substantial non-infringing uses or there's a low prevalence of the specific infringing subclass, that's immaterial when the intent can be inferred from the drug label itself. Now, Genentech's response to the Sanofi case is that the Sanofi case is not applicable because that case involved instructions, sorry, that case involved instructions that encompass the infringing use. Well, I have to disagree with Genentech where it says there's a complete absence of any language encouraging Catzilla's use among the infringing class. That's in Genentech's brief, that there is a complete absence of any language encouraging Catzilla's use among the infringing class. The Catzilla label itself specifically encourages the infringing use among the subclass. It says, give Catzilla after pretreatment with trisuzumab and ataxine. That was more than enough circumstantial evidence to find intent to get beyond summary judgment in this case. Now, I'll reserve the rest of my time for rebuttal. Thank you. Counselor Maynard. Good morning, your honors, and may it please the court. Deanne Maynard on behalf of Genentech. The district court acted well within its broad discretion in striking Figenetz's late disclosed theory here, and that's all the court would need to decide to affirm this case. The district court also correctly granted summary judgment of non-infringement. And on top of that, this patent does nothing but express a plan and a hope to look for something that might work with breast conditions, and it's therefore invalid for three different reasons. That's your cross-appeal. That's our cross-appeal. I don't know whether it's appropriate to deal with the cross-appeal now or whether we should wait. Let's wait. But I do have a question for you on the cross-appeal. Okay. Thank you, Judge Rison. So I'd like to just start with the striking of the expert because, obviously, it gets a very deferential standard of review from this court, which defers to a district court's both application and understanding of their local rules and their understanding of what was going on in their courtroom. This district court had presided over this case for several years. At the time she struck this expert, she'd heard a tutorial, a claim construction hearing. She'd heard argument on Rule 11. She'd heard argument on two summary judgment motions. And she recognized that this was a marked change in the infringement theory, and correctly so, and that it would prejudice us. And I can explain how. Where is the prejudice? The prejudice, it's both in invalidity and infringement, Judge Stoll. So this was before the infringement contentions basically were based on the cat silo label. If you're taking in accordance with the cat silo label, then somehow that triggers this infringes these patent claims. And throughout the litigation, pre-suit to complaint, Rule 11 motion, everything, Genentech's position had been, if your theory is right, if giving cat silo to patients according to the label, i.e. those who have had trastuzumab and ataxin before they get cat silo, triggers this inference upon inference upon inference, that is your infringement theory, then Genentech's own clinical trials anticipate your patent claim. Inherent anticipation, what infringes now, anticipates before, and that was Genentech's constant reframe. And the district court was aware of that. Our expert in infringement contentions, our expert on invalidity in his report, relies on their infringement contentions. At page A190, Spressley says, I'm assuming your infringement contention theory. At A192, our expert lays out a comparison between the, there's a chart at the bottom of A192 that lays out, that compares like the, what Genentech studied versus, and the label, versus their infringement contentions. And so the district court found that only after the court rejected their priority date claim to 2005 did they change their theory. And that debunks any notion they didn't change their theory. They did change their theory. It's about three months between the time that the court issued its order on the priority date and the time that the expert made their position clear in a deposition. She issued her opinion on February 24th of 2017. The expert announced, we found out about the change theory in the expert's deposition on May 31st, 2017. That was after the close of fact discovery. After export reports and rebuttal reports had been exchanged and in the midst of expert depositions. And the district court found that that was the cause and effect, that they changed it and they didn't tell anybody either. So they didn't comply with the local rules in trying to change it. And they knew how to comply with the local rules because previously in the case, they had moved to amend their infringement contentions after they did testing. Do you think there's a distinction between narrowing your theory of infringement and adding a negative limitation? Or is that, do you think, just a semantic distinction? No, I think it's critical and it's what matters here. And so to the infringement theory, what they did here was add a negative limitation. And the upshot of that was, before it had been, the entire cat silo population infringes when you give cat silo according to the label. Now it's affirmatively at least 95% of the patient population does not infringe. And this supposed subpopulation, which at best is less than 5% if it exists at all, is the infringing population. Now Genentech does need to do different studies and different tests because we need to do discovery from them. Why now do you think? What's different? What's different about a patient who only receives trastuzumab and ataxane and nothing else that makes them infringing when you don't think a patient who has received other chemotherapy agents infringes? We need to know from them why that's different. And now the 95% is effectively a control group, right? They say it doesn't infringe. We would need to test that. And we had no reason. So he says we should have tested the whole... We had no reason to test any subpopulation. They had never... And even if we thought they were breaking it up into subpopulations, which ones would we have chosen? Gender, age, prior other conditions, health factors? Suppose that... I'm struggling to try to distinguish between the narrowing that one would regard as being sort of in the ordinary course of things. You drop a few claims or you drop out several patents. Those are narrowing that no one would even blink an eye at. That happens all the time. It's perfectly fine. Versus the kind of prejudicial negative limitation or other changes that you're saying really do change the whole ballgame in a potentially prejudicial way. I mean, if I added that our claims only extend to people with gray eyes, let's say, that's not technically a negative limitation, but it is a strong restriction of the class of It could. the same reason that you're saying. It could. And let me try another way to explain why this is prejudicial here. All along, we were taking their infringement theory, their broad infringement theory that the whole cat's isle of patient population infringes as a concession that any art that covered that population would therefore anticipate if it predated the patent. They took away that concession. That would change how we would frame our invalidity defenses. They also then added a concession, which is 95% of your patient population does not infringe. And the district court entered summary judgment on that, and they haven't appealed that. That's at A4 and A21. So now, they're conceding something different. They've taken away the concession we were relying on for our invalidity case, so we need to retool our invalidity defenses. And they're adding a concession that we didn't know about that now we need to figure out, well, why is it you think those people don't infringe, and what is it about your claims   well, why is it you think those people don't infringe, and what is it about your claims that makes it act differently in these two sets of populations? And so, whatever may be in the case in other cases, and you know, you can think of all different kinds of hypotheticals. This case, it was prejudicial. The district court, who was very familiar with this case and the theories the parties had advanced in it, recognized it was a change, recognized it prejudiced genentech, recognized that in laying prejudice aside that, you know, separate and apart, the district court concluded they violated the local rules by not moving to amend, which would have required them to show diligence in doing so, like they'd done, that they moved timely, and she concluded they hadn't moved timely. She concluded that if they wanted to change their opinion after her February order, they needed to do so right away, and instead, as Your Honor mentioned, they waited until May, and they didn't exactly directly tell us. We had to confirm with them that their expert had meant to change their theory. And she said that prejudiced genentech, it was too far along in the case. Trial was set for November of that year. Trial was set for months away, and the judge said in her order that their failure to comply with the local rules had affected her ability to potentially accommodate the schedule. If I could shift, I would be happy to ask an interim question, but I would like to shift to inducement for just a second. Could you just talk about the Sanofi case? Yes. Yes, Your Honor. I'd be glad to. So this is different than the Sanofi case, because in the Sanofi case, this court recognized that the label there expressly called out the subclass that was infringing. This case is different in two ways from Sanofi. In this case, it's in some ways not like anything you've ever had, because what they're claiming is that the label, which says, gives to somebody who's had trastuzumab in a taxane, it's totally silent as to two things in a way that is different from Sanofi. It's completely silent. In fact, absolutely nothing about encouraging, actively promoting, inhibiting PAP2 or expressing DEFB1, which is what their claims cover. So most of your cases, there's no space or leap of faith between, well, are you or are you not encouraging giving this drug to somebody who has the hospitalization risk factors that are covered in the claims? The question in Sanofi was, does the label do that? And this court said, yes, it does, because it says, give the drug, and then the only example of people who would give the drug for that purpose were in the Athena trial, which was there, and it laid out the factors. That's not this case. There's nothing in this case that directly, where the label here is silent, both as to the claims, it says nothing to the claims, and it's also silent as to this supposed subclass. There's no active inducement with respect to those who have received and nothing else. And then, unlike Sanofi as well, the district court concluded that this is a hidden noncompliant subclass at best with the standard of care, and in Sanofi, the facts were the opposite, that it was a vast majority of people who had it. Do you think that the same analysis would apply, and again, to go back to my example with gray eyes, if the additional limitation were people give this drug only to people with gray eyes, that's the infringement contention, and the label says nothing about gray eyes. It just says, give the drug to people who satisfy the two precursor drug requirement. I think the label would- Would there be inducement in that case, because the theory would be, of course, you would have expected the gray eyed people would be among the category of people that would take it, since you didn't have any indication that it would be limited to people with particular colored eyes. Under the Supreme Court's case law, and this court's case law, I don't think you could infer from the label that was silent about gray eyes, the level of promotion and encouragement that would be required to allow a case based solely on the label, as this one is. And in here, there's the added fact that they don't dispute that, at best, this supposed subclass is less than 5%, there's a very small, the vast majority of the patients. And that's backed up, they would be receiving it contrary to the standard of care, the ASCO standard of care is that you should receive a third agent per JEDA. Would your answer be different if the class that was identified was not 5%, but was 95%? It would be, perhaps, a harder case, Your Honor, but no, I think the label would still be silent. The label is silent, and again, the gulf here between what the label says at all, and what the claims cover, and you get into the willful blindness here, there's no evidence that Genentech knew that encouraging anybody to take CADSILA was causing the inhibition of PAX1 and expression of DEFB1. Do you think willful blindness has any application at all to intent? I mean, the Supreme Court talks about it in terms of knowledge and global tech, but not intent. And from the criminal law from which it derives, it's really talking about knowledge, not intent. So do you think willful blindness has a place when we're analyzing intent? Well, I think one can break it down into sort of too many buckets to not matter. The question is, do we meet the statute, which requires active inducement, and you have to have the specific intent to promote or encourage someone to infringe the claims, not just take an act. And when you look at it here, we had no knowledge that giving CADSILA to anyone, much less this subpopulation that they've come up with very late, late, late into the case, was infringing their patent claims. Could I ask you about the cross-appeal? Yes, please. I'm wondering why we have jurisdiction over the cross-appeal. Now, you've correctly, I think, identified this as a cross-appeal case, perhaps in excess of caution, but in any event. But the problem I see is that this is the denial of summary judgment, which normally we don't have jurisdiction to review. So why is it that we have jurisdiction to review the denial of summary judgment, which is in the posture of a cross-appeal, not in the posture of defending a judgment on an alternative ground? Because it seems to me, and we have a couple of cases that talk about this, it seems to me that there's no jurisdiction in that setting unless I'm missing something. Well, so we did not raise a counterclaim. This is just a defense in this case. And so it is an affirmative... Go ahead. So I think your appellate jurisdiction, Judge Bryson, stems from the 1291 judgment on non-infringement. That's the judgment. It's properly in this court. Are you suggesting we have pendant appellate jurisdiction here over the cross-appeal? No, I'm suggesting that. So there's only one claim here in this case, theirs. We did not make a declaratory judgment counterclaim. Okay, well, let me make myself clear on the thing that's bothering me. Either it's not a cross-appeal, which I thought was where you were kind of going, or it is a cross-appeal. If it is a cross-appeal, it does seem to me that you have to satisfy all the requirements for jurisdiction for an appeal, which would mean that you couldn't appeal from the denial of summary judgment. If it's not a cross-appeal, i.e. for some reason such as that you didn't file a counterclaim, but rather you filed a defense, and therefore you couldn't... Your judgment isn't going to be broader than simply a non-infringement judgment, then it seems to me you have to deal with the problem that the judgment, if it's predicated on your validity, it actually is broader in its effect on the plaintiffs, right? Because in a later proceeding, for example, the collateral estoppel effect of a judgment that it's predicated on invalidity would bar them in a way that a judgment predicated on non-infringement would not. So it seems to me that suggests that it does have to be a cross-appeal. And if so, where do we have jurisdiction? So I think you have jurisdiction over the case. The only claim in the case is their claim for infringement. The judgment on that claim was entered in our favor on grounds that we don't infringe and that they have no evidence of infringement. And that's the 1291 judgment. That judgment's on appeal. We know that... I think there are two separate issues. I agree with your analysis completely, but I think, except the conclusion, which is I think there's two... Because I think the questions are separate. Do you have appellate jurisdiction over the judgment? Yes, I think you do, under 1291. The only claim is their claim. Judgment's entered. There's a final judgment in this case. That case is properly in this court. If we want to defend the judgment of non-infringement on the alternative grounds that the claims are invalid because that would... I think you can conclude two things. Because that... It can't be that you can't reach it because it's an alternative ground to the judgment that's properly before you. So I think you can conclude one of two things. We didn't need to note a cross-appeal. And we did so out of an abundance of caution, and we wrote our opening brief within the word limits of a regular brief. In case you decided we were mistaken, and then you can strike our reply brief. And I still hope you would address the invalidity because these issues are important. But... Or you can conclude that you have jurisdiction, appellate jurisdiction, over the whole case, and we properly noted a cross-appeal because, as you note, affirming in the alternative ground on invalidity would lessen their rights and enhance ours. And so we've properly given, noted an appeal on that basis. Sounds like what you're saying is there's pendent appellate jurisdiction. Okay. Well, I'm happy for you to label it that way. Well, except that we have cases that say that you can't use pendent appellate jurisdiction in this setting. Well, but this is an affirmative... This is an alternative ground, right? To affirm the only claim in the case and the only judgment in the case, so... But it's an alternative ground, which you're required to bring as a cross-appeal, but by hypothesis. Right. And I think that, I think, unlike in Cardinal Chemical, unlike in, like, if we had brought a declaratory counterclaim, this Court's not, like, required to reach our invalidity claim. And so you could, like, as if I had appealed a claim construction issue, for example, in the midst of their appeal, for which there was also, that's an example for which there's also no, you know, separate appealable. I couldn't appeal a claim construction issue, but I can raise it in my red brief as an alternative ground. So this is a conditional cross-appeal in your view? No, because I think a conditional cross-appeal, it has a different meaning. I think it's... Well, in other words, if we rule in your favor on the issue on which you're appellee, are you saying we nonetheless should deal with the cross-appeal? I think you don't have to. Well, do you want us to? And I think we would like you to hold these patents invalid, because just as a public service, like, these patents are, they are just merely a plan to hunt for something. They lack utility. They aren't enabled. They are hugely broad. They don't specify any compounds that, if you just, like, look at the indirect inhibition, and they tell no one how to do it, and they don't, certainly don't show possession of the breadth of their claims. So if we rule in favor of the appellee, you withdraw the, what you called your cross-claim? Well, so if you, if you, I think you can affirm, I think it's up to the court's discretion whether to go on and decide the invalidity if you affirm the judgment on either of the grounds given by the district court. In the course of your research on this, you do cite the typewrite case, which seemed to me to be appropriate. Did you run across Advanced Software Design Corporation? That, standing here, that I, I don't recall. Okay. All right. And CEMCON against Micron. Those are two cases that deal with this problem. Now, Advanced Software is like this case with one exception, which is an exception you've pointed out, that it had a counterclaim in it. So I'm, other than that, it's a cookie cutter of this case. So I'm wondering, is that enough to convert this from a case in which, as in the Advanced Software case, we dismissed the cross appeal into a case in which we don't? I think that... Your suggestion earlier was, yes, that's an important factor. I think it is an important factor because I think the only claim in this case, there was final judgment under 1291, and that case is properly before the court. And we, we have noted a cross appeal out of an abundance of caution in case you perceived that ruling for us on this alternative ground to get to the same judgment of non-infringement would enhance our rights or lessen theirs. But I don't think you need separate appellate jurisdiction over that cross appeal, given that there's only one claim in the case and the final judgment's under 1291. But I'd be happy to submit a letter on, on those cases if you would like, Your Honor. If, uh, I think, have I run over my time? Yes, you have run over your time. I, I apologize. Thank you, Judge Renia. We would request that you affirm. Hello again. Hello. Do you have any, uh, anything to say on the, uh, on the viability of the cross appeal? Uh, I do not. I trust, uh, uh, this panel will make the right decision. Uh, we're willing to talk about the invalidity issues. You, you, you may have too much confidence in us. Um, I, I would like to talk, uh, about a couple of things Ms. Maynard raised. Um, one of them was, uh, there's this narrative about how this alleged change, uh, or narrowing of Figenix's, uh, infringement theory stemmed from a, the court's decision on a, a priority date issue. Uh, as Ms. Maynard recognized, that, uh, decision came down in February of 2017. The month before that, in open court, Figenix's former counsel made it clear that the infringement theory concerned a combination of trastuzumab and a taxane, uh, with, with catzilla and nothing else. Uh, and that is at, um, appendix page 429 and 430. Specifically there was discussion of some potential, potentially invalidating prior art and Figenix's counsel said that, well, this, this previously clinical trial, they're being given a much different cocktail here, uh, that's not just trastuzumab and a taxane. In the end, I think that, uh, Figenix agrees with, uh, the district court's initial impression of this issue, uh, which the judge, uh, announced at a hearing, um, on these motions. That's at appendix 349. The district court said, I'm loath to strike the infringement contention because the way it's worded, I don't think it needs to say Herceptin, a taxane, and nothing else. When it says Herceptin and a taxane, that's what the contention is. And just to be clear, Herceptin is, is a brand of trastuzumab. On the, on the prejudice issue, Denentech recognizes that the district court did, um, find there could be some prejudice. However, the actual prejudices, uh, were never really explained. Again, if, if the infringement contentions say I'm targeting, uh, people with gray eyes, blue eyes, and green eyes, and then later the expert says, well, sorry, I can't support those theories on the, the latter two, uh, the defense still has to prepare its non-infringement position with respect to the gray eyes. What about the, what we heard from Ms. Maynard about how the, there, with the broader infringement contentions, there was some ability to rely on those for proven validity or invalidity in this case. And, uh, theoretically speaking, uh, there could be a case where, um, the infringement theory is narrowed and necessarily the, uh, the claim interpretations that the plaintiff is adopting have narrowed and some, some piece of prior art that would have applied to the broader theory doesn't apply. However, I haven't seen from Denentech any specific prior art that falls into that bucket. I think their position is that they were practicing the prior art. And so they were practicing the part that was then not included in the more narrowed infringement contentions. Uh, again, um, I don't, I didn't see that argument being made in the briefing or any specific instance of, of a piece of prior art. But if that were the case, would that be prejudiced then? It could be. Uh, and on the abuse of discretion point, um, applying an apposite law, uh, I believe is an abuse of discretion. I will hit the validity issues with the time I have remaining. Some common themes across, uh, the, the validity issues is that invalidity has to be, be shown by clear and convincing evidence. Uh, these specific invalidity issues we're dealing with, uh, in Denentech's cross appeal are highly factual in nature. Utility is a question of fact. Uh, written description is a question of fact. And enablement is a question of law, but the real dispute here pertained to, uh, whether there was undue experimentation, which is also, uh, a factual inquiry. On enablement, the real question came down to, was the, was any experimentation required undue? And there was no real quantifying evidence or evidence quantifying the amount of this experimentation that would have been required. Phygenics' expert analyzed the WANS factors and said, no undue experimentation. Genentech's expert says, well, it looks like the number of compounds you'd have to identify would be enormous. I don't know what enormous means. Uh, the district court didn't either. This case is not like the Wyeth case where there was evidence showing that the experimentation would have had to have been performed on tens of thousands of compounds, each of which would have taken weeks to assay. That's a lifetime of undue experimentation. We don't have any such quantifying evidence here. On, uh, written description, Phygenics, uh, presented expert testimony on the issue, um, extensive expert analysis saying the person of ordinary skill in the art would have understood that the inventor was in possession of the invention. Genentech countered that with, uh, attorney argument only. And for utility, this court has told us that's, that's, utility is not a high bar. Uh, there's no debate that the, the patent discloses utility with respect to prostate cancer. Uh, Phygenics' expert provided testimony indicating that you could correlate those findings and understanding with respect to prostate cancer over to breast cancer showing the utility there. And I believe I'm out of time. Thank you. Thank you. I'm going to give you back your three minutes. Thank you Judge Rainier. Uh, I really appreciate that and I'll limit my comments to the cross appeal. Um, the, um, the, this patent as I indicated in, in my opening remarks really just sets forth a plan to hunt for something that may or may not work with breast cancer. Um, every working example is about prostate cancer and there's nothing in, so, so basically for all, for the same reasons it lacks utility, it, it's not enabled and it lacks written description. I'm happy to focus on any one of those theories if your honors would like. Um, but our, our, as, as far as utility, um, the, our expert gave unrebutted testimony that a person of skill in the art would not just infer from the fact, uh, the prostate working examples that, that, that they would work with, um, with breast cancer. And the patent only says what could be done, what might be done. The examples beginning with example 12 will be determined, you know, might be considered. The district court held that, uh, there was nevertheless a dispute of fact because there was, she felt like there was analytical reasoning in the patent to go from the one to the other. But as this court held in Rasmussen and Jansen, mere analytical reasoning is not enough unless a person of skill in the art would consider it to be obviously correct. And as I said, there's unrebutted testimony from our expert at appendix 168, um, uh, paragraph one, uh, in, in, um, appendix 2300 to 2301 that an expert wouldn't expect it to work. In terms of enablement, um, that's a question of law and this court can, can decide here. The claims are extremely broad. It's a method of treating, uh, that compositions that are defined only by their function. So, and under the claim construction order, it doesn't encompass just things that directly, um, affect PACS 2 or DEF B1, but also anything that indirectly affects the pathways upstream from them in such a way that it affects them. And that as is, it's undisputed, is an enormous subset and, but, and, and they say, well, it would be routine. All they say is, well, it would be routine to test, but one, all they say is it would be routine, routine, routine to test for PACS 2, but they, there's not a single example of a class of compounds or any compound within them that you could use to treat breast conditions. So the, uh, the, at column eight through column 12, there's just a laundry list of large molecules and small molecules, but they point to nothing in the patent and nothing in the patent teaches anything about treating, which even an example of something that treats breast conditions or breast cancer. And then there's no examples of, of how to affect DEF B1, which the claims cover as well. Instead, they focus on, well, it would be routine to test for what affects PACS 2, but even under YF, the enormous number of compounds that would need to be treated, especially given their infringement theory now, that it matters what you've had before. So not only do you have to figure out which compounds are in, you know, in this set, you have to figure out like, and under what conditions would it matter? And nothing in the patent teaches someone of skill in the art how to do that. Written description, it's a similar problem, you know, and under, they say it's a question of fact, but under this course decision in Rochester, a patent can invalidate itself and that's the situation here as a matter of law. And I think the shortest, shortest path from the specification here to invalidity on written description is, is the claim to the indirect inhibitors. So as I said... Can you conclude your... Oh yes, I'm sorry. I apologize. Thank you Judge Rainey for your patience and we request that you affirm the judgment. We thank the parties for their arguments.